IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATHANIEL LAND, | CASE NO. |
| Plaintiff, | 1:23-CV-000793-PAC |
| v. | |
| | DEFENDANTS' SUR-REPLY IN OPPOSITION OF MOTION FOR PRELIMINARY INJUNCTION |
| NIR ROKAH and BINA – N.R. CONSULTING LTD., | |
| Defendants. | |

## Introduction

Mr. Land's Reply attempts to distract the court with misdirection and sleight of hand, however, none of that can change the nature of this ongoing dispute: Mr. Land, along with others, perpetrated a fraud on Mr. Rokah causing him to lose $2 million earmarked for a potential investment. When reciting Mr. Rokah's claims against him in his Reply, Mr. Land conveniently leaves out the claim against him for "fraud."[1] Plain and simple, Mr. Land, as a FINRA licensed and registered representative, individually and using his approved outside business activity, Clear Landing, as a tool, carried out a fraud against a customer, Mr. Rokah and BINA-NR Consulting, Ltd. ("BINA"). Accordingly, as Mr. Rokah's Memorandum of Law outlines, this dispute was properly brought before FINRA arbitration, and Mr. Land's motion for injunctive relief should be denied, confirming FINRA's jurisdiction over the matter.

---

[1] Mr. Land falsely states that the claims against him do not involve fraud despite repeated references (26 in the document overall) to fraud in the Statement of Claim filed in FINRA"
   A) "**Mr. Land's fraud**, which directly caused Claimants' principal losses of approximately $2,000,000." *See* **Exhibit A, p. 13.**
   B) "C. **FRAUD**; AIDING & ABETTING **FRAUD**" *See* **Exhibit A, p. 28.**
   C) "BHS aided and abetted **Land's fraud**…" *See* **Exhibit A, p. 28.**
   D) "Respondents acted as a co-conspirator to the **fraud** perpetuated on Claimants." *See* **Exhibit A, p. 28.**
(Emphasis added)

1

**Argument and Citation of Authority**

**A. Defendants Were Customers of Mr. Land Within The Meaning Of FINRA Rule 12200.**

    **1. The Corporate Veil Of Clear Landing Should Be Pierced.**

Although piercing the corporate veil of Clear Landing is duplicitous in conferring personal liability on Mr. Land because his personally fraudulent actions against Mr. Rokah and BINA were undertaken as a registered person of a FINRA member conducting approved outside business activities, under well-settled New York case law, Clear Landing's corporate form should be disregarded to expose Mr. Land, personally, to the damages incurred by Mr. Rokah in the present dispute.[2]

To pierce a corporate veil in New York, a party must show that, "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Morris v. State Dep't of Taxation and Fin.,* 82 N.Y.2d 135, 141 (1993). Further, "because a decision to pierce the corporate veil in a given instance will necessarily depend on the attendant facts and equities… cases may not be reduced to definitive rules governing the varying circumstances when the power may be exercised." *Id.*

---

[2] It is important to note that per the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 8(d)(2-3), a claim such as those brought by Claimants may be pled in the alternative, and FINRA has minimal pleading standards. Additionally, Claimants need not meet federal or state pleading standards in FINRA arbitration, a principle that applies to piercing the corporate veil as well. *See below for relevant rules:*

F.R.C.P. Rule 8(d)(2-3) state, "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient," and, "A party may state as many separate claims or defenses as it has, regardless of consistency."

FINRA 12100(x) defines pleadings as "a statement describing a party's causes of action or defenses." *See* **Exhibit Q**.

To determine if a corporate entity has been so dominated by an individual as to warrant the disregard of the corporate form, New York courts consider the totality of the circumstances and relies on numerous factors, none of which are dispositive. Relevant "domination" factors include:

> (1) The absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.* issuance of stock, election of directors, keeping of corporate records, and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other corporations as if it were its own.

*Wm. Passalacqua Builders v. Resnick Developers*, 933 F.2d 131, 139 (2d Cir 1991).

Although New York law is ambiguous on the differentiating factors between piercing the veil of a corporation versus a limited liability company ("LLC"), it is undisputed through New York case law that LLCs can be pierced, and the factors outlined by the *Passalacqua* court are applicable to LLCs. *See, Retropolis, Inc. v. 14th St. Dev. LLC*, 17 A.D.3d 209 (1st Dept. 2005) (establishing "the doctrine of piercing the corporate veil… applies to limited liability companies); *Grammas v. Lockwood Assoc., LLC*, 944 N.Y.S.2d 623 (2d Dept. 2012) (holding "a party may seek to hold a member of an LLC individually liable despite this statutory proscription [of personal liability protections for LLC members] by application of the doctrine of piercing the corporate veil."); *Last Time Beverage Corp. v. F&V Distrib. Co., LLC*, 98 A.D. 947 (2d Dept. 2012) (holding the Supreme Court properly considered the *Passalacqua* factors in piercing the veil of an LLC).

Here, Mr. Land perpetuated a fraud against Mr. Rokah and BINA, personally and using his domination of Clear Landing as a tool, which resulted in monetary injury warranting the court to pierce the corporate veil of Clear Landing and expose Mr. Land to personal liability for Mr. Rokah

and BINA's damages. As he acknowledges, Mr. Land, as the sole member of Clear Landing, was *literally* the only person in position to dominate the operations of Clear Landing, and he did just that. *See* **Land Reply, p. 6**. The corporate formalities of Clear Landing were undoubtedly a façade. Mr. Land solely, not "sometimes" as he would like the court to believe, communicated with Mr. Rokah through his personal Gmail account and cell phone number. *See* **Exhibit O**. Further, Mr. Land purported to invade Mr. Rokah's funds to pay his alleged "rent" obligations as a FINRA registered representative independent contractor of BHS and to pay his personal taxes, indicating that Clear Landing was not adequately capitalized. *See* **Exhibit W** *and* **Exhibit G**.

At the time the relationship between Mr. Land and Mr. Rokah began, his office was housed on BHC Fund Management's ("BHCFM") premises, and Clear Landing utilized Mr. Land's "office" there as well as "manpower" services and amenities of BHCFM. *See* **Exhibit W**. Sometime after, Clear Landing moved its "business" office to 225 East 34th Street, *Apartment 9C*, New York, NY, a building that markets itself as a "luxury condo building." *See* **Exhibit J**. Considering the foregoing in light of the *Passalacqua* factors, it is abundantly clear that Mr. Land utilized Clear Landing as his alter ego in an attempt to shield himself from personal liability. This is an issue for the arbitrators, and the equities and inferences lie in favor of allowing the action to continue at FINRA.

As to the second *Morris* prong, the facts outlined by Mr. Rokah and BINA speak for themselves that Mr. Land's fraud resulted in Mr. Rokah and BINA's injury. Mr. Rokah deposited funds with Mr. Land that he was contractually obligated to hold until a deal with ARIDO materialized. Mr. Land wrongfully invaded the funds, contrary to the written agreements, causing Mr. Rokah to lose his *entire* $2 million deposit. Similarly, Mr. Land himself fraudulently induced Mr. Rokah to deposit funds on promises of a collateral agreement where Mr. Land purported to

personally have possession and control of numerous, expensive artworks that would serve as collateral to *all* Mr. Rokah's deposited funds. Mr. Land knew full well that he did not have title or possession of the artworks when he made the agreement. In fact, in an admission of that fraud and fraudulent inducement, Mr. Land then tries to shift his conduct to Messrs. Raphael and Chappell, accusing them of fraud and fraudulent inducement. *See* **Exhibit A, Sub-Exhibit A-K**. However, in fact, it was he, Mr. Land, who knowingly made false promises of having possession and custody of artwork which he did not.

### 2. Defendants Had Agreements with Mr. Land Under Which Mr. Land Was Obligated To Provide Services And Collateral.

While Mr. Land continuously attempts to discredit Mr. Rokah's claims, his arguments involving escrow agreements are inconsistent. On one hand, Mr. Land argues there was an escrow or depositor relationship in an attempt to distance himself from a potential investment; on the other hand, Mr. Land argues there was no escrow agreement to evade the escrow obligations. He cannot have it both ways. Casting aside semantics and factual issues for the arbitrators, Mr. Land was integrally involved in the proposed investment from the outset; Mr. Land expected and wrongfully took compensation, and furthermore, as the communications between Mr. Rokah and Mr. Land show, he was the conduit through which Mr. Rokah would receive potential investment updates from and to whom Mr. Rokah would provide feedback. *See* **Exhibit O**. With the invoice deposit agreements and collateral agreements, it is impossible for Mr. Land to claim there are no agreements. *See* **Exhibits I** *&* **J.**

### 3. The Case Law Offered By Mr. Rokah Supports The Conclusion That Mr. Rokah Was A Customer Of Mr. Land For FINRA Arbitration.

Mr. Rokah was both a customer of Mr. Land and BHS. BHS proudly touted Mr. Land's outside business activity though Clear Landing on BHS's own website and approved the same. *See* **Exhibit F**. FINRA Rules 3270 and 3280 stipulate that "[a] firm approving a [Private Securities

Transaction] where the associated person has or may receive selling compensation <u>must record and supervise the transaction as if it were executed on behalf of the firm</u>." *See* **Exhibit L** (emphasis added). To summarize, when an associated person is doing something that is recorded in the books and records of a member, as if executed on behalf of the member, it is now part of their role as a registered representative and subject to FINRA member firm supervision. As a result, the activities of Mr. Land individually and through his approved outside business activity, Clear Landing, were done "as if executed on behalf of the member firm," i.e., subject to arbitration. Moreover, here we see Mr. Rokah and BINA's money going directly to the member firm and Mr. Land. *See* **Exhibit G**.

Mr. Land attempts to distinguish the case law supporting Mr. Rokah's claims to no avail. The applicability of *Gilmore v. Brandt*, 2011 U.S. Dist. LEXIS 125812 (D. Colo. 2011) is readily apparent to the facts on hand. In *Brandt*, an associated person solicited an investment in a corporation from an investor outside of the associated person's relationship with his member firm. Once the investment soured, the investor filed a Statement of Claim before FINRA, and the panel of arbitrators ruled favorably for the investor. The associated person moved to vacate the FINRA award alleging that the arbitrators lacked jurisdiction over the dispute. The court ultimately confirmed the arbitration award, correctly reasoning that "[i]f an 'associated person' of the member firm induces, or shepherds, the investment, then the investor is *also likely* a customer of that firm." *Brandt at \*12* (citations omitted) (emphasis added).  Further, the court reasoned that:

> the associated person's "attempt to parse the issue more finely, by arguing that the dispute must relate to [his] activities with [his member firm] and not merely [the investor's] investment in [the corporation], not only overstates the facts regarding the separation of interest between [the member firm] and [the corporation], and [the associated person's] own relationship with [the corporation], but also would impose a more demanding standard that the rule itself requires."

*Id.,* at \*14-15 (internal citations omitted).

Here, Mr. Land's restrictive definition of customer is equally insupportable under FINRA Rule 12200. Just like the investor in *Brandt,* Mr. Rokah was an investor with an investment being created by Mr. Land. Paralleling the actions of the associated person in *Brandt,* Mr. Land, as his communications with Mr. Rokah show, served as the "shepherd" of the ARIDO investment opportunity, keeping Mr. Rokah apprised of developments and acting as a liaison between all parties involved. *See* **Exhibit O**. Just like the investor in *Brandt* when his investment soured, Mr. Rokah sought to arbitrate the present dispute because the dispute involved an investment with an associated person and their outside business activity. Finally, mirroring the associated person's behavior in *Brandt*, Mr. Land attempts to distract the court by downplaying the lack of separation within the potential investment between himself, BHS, and ARIDO, each of which profited in the potential deal at the expense of Mr. Rokah. *See* **Exhibit G**.

Mr. Land also highlights *Triad Advisors, Inc. v. Siev*, 60 F.Supp. 3d 395 (E.D.N.Y. 2014) for its purported dissimilarities to the facts at hand but misses the mark almost entirely. In *Siev*, the court denied a motion to stay arbitration and determined arbitration was consented to because it found that an associated person of a member was compensated for providing a service to customers that did not have an account with either the associated person or the member firm. To summarize the court, "Defendants' position is essentially that because [the associated person] provided them with a service – investment advice and an introduction, and at least some effort to facilitate the [investment] transaction – and received [compensation] as a result, it follows that defendants were his customers. I agree." *Id.*, at 397.

Here, Mr. Rokah and BINA are correctly Mr. Land's customers under the same principles. Mr. Land provided, or at least agreed to provide, services to Mr. Rokah and BINA. By his own words present in each of his deposit invoices, Mr. Land provided services to Mr. Rokah "of

7

potential purchases regarding 'ARIDO Brands' collectible art." *See* **Exhibit I**. A review of the communications between Mr. Rokah and Mr. Land clearly shows that Mr. Land was working with an investor, here Mr. Rokah, to aid in the solicitation of and to solicit potential investments. *See* **Exhibit O**. Mr. Land leads the court to believe that he never provided any services to Mr. Rokah, but if that was the case, he fails to explain the litany of correspondence he sent to Mr. Rokah pertaining to Mr. Gargari's potential purchase of the jewelry line; and the summary of a potential deal with an Italian company owned by a famous art dealer and collector and its partner, a U.S. foundation, he sent Mr. Rokah on March 6, 2020; and the proposal with Melior Suisse SA that Mr. Land sent to Mr. Rokah on July 2, 2020. Mr. Land kept Mr. Rokah apprised of these developments because he was providing services to Mr. Rokah. *See generally,* **Exhibit O**. It is well established that Mr. Land utterly failed in his obligations of sourcing a final buyer for the ARIDO line; however, his failure highlights the fraud he perpetrated against Mr. Rokah and BINA, taking $2 million for his own benefit and the benefit of his co-conspirators.

Further supporting the applicability of *Siev* is the fact that Mr. Land, by his own admissions, expected compensation for the services he provided to Mr. Rokah. Then upon wrongfully invading Mr. Rokah's deposited funds, Mr. Land, per his ledger, used some of the proceeds to satisfy personal obligations (such as taxes and allegedly rent) clearly indicating that he was compensated indirectly, like the associated person in *Siev*, for the services he provided. Moreover, there is a trail of funds from Mr. Rokah to Mr. Land's member firm, BHS. *See* **Exhibit G**.

Contrary to Mr. Land's assertions, *Viyella v. Fundacion Nicor*, 2020 U.S. Dist. LEXIS 34300, (S.D. Fla. 2020), is applicable because it confirms the proposition that disputes involving the negligent supervision of an associated person's outside business activity are properly brought in arbitration since supervision is unquestionably a "business activity" of the member. Similarly,

the present dispute was properly brought in arbitration because it involves, in part, the lack of supervision on behalf of a member, here BHS, of one of its associated person's outside business activities, here Mr. Land and Clear Landing. Mr. Land's activities with Clear Landing became business activities of his member firm, thus, also the business activities of the registered representative of that member as if it were executed at the firm.

### B. Mr. Land Engaged In "Selling Away" As A Registered Representative Of A Member Which Brings The Present Dispute Under FINRA's Jurisdiction.

Although Mr. Land would have the court believe that Mr. Rokah's role in the overall investment opportunity was simply as holder of an option to buy the ARIDO line for $100 million, a closer look at the facts correctly reveals that Mr. Land personally engaged in fraud as well as used his disclosed, recorded, and supervised outside business activity, while an associated person of a FINRA member, which is why the dispute was properly brought in arbitration. *See* **Land Reply, p. 9**. Mr. Land knew that Mr. Rokah did not simply purchase an option contract[3] under their agreement. In fact, Mr. Land documented a deposit for a future transaction that never materialized, but his actions, nonetheless, were part of activity on the books and records of his member firm, so supervised. The disputed transaction involved a potential investment and services that Mr. Land was obligated to, but failed to, perform in furtherance of a potential investment, never "an option to buy goods." Mr. Rokah and BINA had no interest in owning jewelry.

### C. Although Rule 65 Of The Federal Rules Of Civil Procedure Controls, New York's Preliminary Injunction Standard Is "Substantially Similar" To The Federal Standards.

Although "[t]he question whether a preliminary injunction should be granted is generally one of federal law even in diversity actions, though state law issues are sometimes relevant to the decision to grant or deny," Mr. Land is misguided in pointing out Mr. Rokah's reliance on *Scotto*

---

[3] Options are contractual investments, and there is no options contract here.

*v. Mei,* 219 A.D.2d 181 (1ˢᵗ Dept. 1996). *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987). In considering a plaintiff's motion for injunctive relief which cited New York state standards, the Southern District of New York has determined that "[e]ven if this Court were to apply state law to Plaintiff's claims, it would reach the same result, because the showing that Plaintiff must make under state law is substantially similar to the one under federal law." *Sterling v. Deutsch Bank Nat'l Trust Co.*, 368 F.Supp.3d 723, 727 (S.D.N.Y. 2019). *See also, Int'll Home Care Servs. of N.Y., LLC v. People's United Bank, Nat'l Ass'n*, 2020 U.S. Dist. LEXIS 176084 (E.D.N.Y. 2020) ("even if the Court were to apply New York law in deciding Plaintiff's PI motion, it would arrive at the same conclusion given the substantial similarity of the showings that Plaintiff must make under either state or federal law").

Further, the rules cited by Mr. Rokah in the argument of his Memorandum of Law mirror the standards under Federal Rule of Civil Procedure Rule 65 and the standards outlined in Mr. Land's Memorandum of Law.

## Conclusion

For the reasons set forth herein and in Mr. Rokah's initial response, the motion for a preliminary injunction should be denied and FINRA arbitration should be compelled.

Dated:     March 3, 2023
           New York, New York

                                              **MALECKI LAW**

                                              */s/ Jenice L. Malecki*
                                              _____
                                              Jenice L. Malecki, Esq.
                                              *Attorneys for Mr. Rokah and BINA-NR*