UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

NATHANIEL LAND,

                      *Plaintiff,*

    -*against*-

NIR ROKAH and BINA – N.R.
CONSULTING LTD.,

                *Defendants.*

------------------------------------------------------------X

                    23-CV-793 (PAC)

                    **OPINION & ORDER**

Plaintiff Nathaniel Land moves for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 to enjoin an arbitration currently pending before the Financial Industry Regulatory Authority ("FINRA") between Plaintiff and Defendants Nir Rokah and BINA-N.R. Consulting Ltd. (collectively, "Defendants"). Defendants cross move to compel that same arbitration. The Court held a hearing on the motions on March 17, 2023. The Court **GRANTS** Plaintiff's motion for a preliminary injunction for the following reasons: (1) the parties have no formal agreement to arbitrate; (2) Plaintiff has raised serious questions as to whether there was a customer relationship between him and Defendants; and (3) Plaintiff has raised serious questions as to whether this dispute arose out of his business activities. Defendants' motion is **DENIED**.

## FINDINGS OF FACT

This case arises out of a broken business deal between three individuals and their respective entities—Plaintiff and his business Clear Landing Capital, LLC ("Clear Landing")[1]; Defendant

---

[1] Clear Landing, which is not a registered FINRA member, is not a party to the FINRA arbitration and is therefore not a party to this action. *See* Pl.'s Mem., Ex. 1 ("Land Decl.") ¶ 3, ECF No. 5.

Rokah and his investment vehicle BINA-N.R. Consulting; and a third-party named Yishai "Jesse" Raphael and his company ARIDO Brand Jewelry ("ARIDO").[2]   This case does not involve securities, but rather it concerns $2 million Defendants transferred to Plaintiff between 2018 and 2020 as a part of a potential transaction to purchase ARIDO jewelry.   Unless otherwise noted, the following facts concerning that transfer are not in dispute.

At the time of these events, Plaintiff was a registered FINRA representative and an associated person of Brooks, Houghton Securities, Inc. ("BHS").   Malecki Decl., Exs. D, E, ECF No. 18.   BHS is "engaged in the offering of private company equities and debt primarily from financial institutions."   Malecki Decl., Ex. D at 9.   It primarily transacts in secured financial instruments.   Id.   Defendants had no direct interaction with BHS.   Rather, in addition to his work with BHS, Plaintiff operated another business called Clear Landing, which is not a FINRA member.   Defendants' allegations focus on Plaintiff's actions as the sole owner and employee of Clear Landing.

In or around July 2018, Clear Landing entered into an agreement with Mr. Raphael and his company ARIDO brand jewelry ("ARIDO") to provide consulting services.   Pl.'s Mem., Ex. 1 ("Land Decl.") ¶ 5, ECF No. 5; Malecki Decl., Ex. N.[3]   ARIDO is, according to Defendants, an "exclusive" brand of artisanal jewelry.   Mr. Raphael and his partner, Thomas Chappell, sought to promote a line of luxury diamonds to a series of investors.   According to an unsigned memorandum provided by Defendants, Clear Landing provided, among other things, (1) marketing support for

---

[2] Neither Mr. Raphael nor ARIDO is a party to this action or the FINRA Arbitration.

[3] This document as produced to the Court is unsigned.   Defendants however expressly rely on it and Plaintiff acknowledges that Mr. Raphael engaged Clear Landing to provide consulting services.

investment opportunities; (2) assistance in negotiations for transactions; and (3) "establishing appropriate infrastructure" for transactions. *Id.*

Separate from the consulting services agreement between Clear Landing and Mr. Raphael, in August 2018, Defendant Rokah and Mr. Raphael reached an oral agreement ("Oral Agreement"), ostensibly giving Defendants the opportunity to profit from ARIDO. Compl., Ex. A ("Statement of Claim")[4] at 5, ECF No. 1. The parties dispute the exact terms of the Oral Agreement. Defendants allege the terms of the Oral Agreement were as follows:

> (a) [Mr. Rokah] would deposit a total of $2 million in a Clear Landing bank account in exchange for an option to purchase the exclusive ARIDO line of diamond jewelry in the amount of $100,000,000;
> (b) the funds [Mr. Rokah] invested would be held by Clear Landing as a deposit that would not be used at all;
> (c) If [Mr. Rokah] decided that he was not interested in promoting the transaction or if Mr. Raphael, Mr. Land, and Clear Landing failed in securing a buyer for the line of jewelry, the funds [Mr. Rokah] deposited with Clear Landing would be returned in full to [his] account in Israel; and
> (d) If Mr. Raphael, Mr. Land, and Clear Landing were successful in securing a buyer for the line of jewelry, the sale price would be divided evenly between Mr. Raphael, Mr. Land, and [Mr. Rokah], one-third each.

Rokah Decl. ¶ 7, ECF No. 16. Plaintiff on the other hand, alleges that he only received instructions from Mr. Raphael that Defendants "would be wiring funds to ARIDO to be received by Clear Landing." Land Decl. ¶ 8. While he does not address every alleged term of the Oral Agreement, Plaintiff vehemently disputes that the funds at issue were to be held in escrow. *Id.* ¶ 7. All parties appear to agree, however, that (1) Defendants wired a total of $2 million to Clear Landing's checking account and (2) Plaintiff was not present at the meeting where Defendant Rokah and Raphael reached the Oral Agreement. *Id.* ¶¶ 7, 10–12; Rokah Decl. ¶¶ 7, 11.

---

[4] A claimant initiates a FINRA arbitration by filing a statement of claim with the FINRA director, detailing the relevant factual and legal allegations. *See Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 94 (3d Cir. 2018).

Pursuant to this alleged Oral Agreement, Defendants deposited funds with Clear Landing on six separate occasions, totaling $2 million.  Rokah Decl. ¶ 11.  Those deposits were memorialized in "deposit agreement[s]."  *Id.*; Malecki Decl., Ex. I.  Each deposit agreement is a one-page, identical document stating "Clear Landing will provide services of potential purchases regarding 'ARIDO Brands' collectible art.  [The] Deposit payment . . . will go toward payment of final deal which will be determined in a later date."  Malecki Decl., Ex. I  Each document is signed by Plaintiff in his capacity as president of Clear Landing.[5]  *Id.*

While Defendants continued to deposit funds with Clear Landing, Plaintiff continued to perform services for ARIDO.  Defendant Rokah alleges that on or around April 2019, he met with Mr. Raphael, Plaintiff, and an art collector named Tommaso Gargary to discuss Gargary's potential ARIDO purchase.  Rokah Decl. ¶ 13.  At this meeting, Defendant Rokah alleges he learned that Plaintiff did not hold the wired funds as he was required to do pursuant to Defendants' understanding of the Oral Agreement, but rather spent the $1.5 million from payments that had, at that point, been deposited.  *Id.* ¶¶ 13–14.  Upon learning of Defendants' displeasure, Plaintiff provided Defendant Rokah with a handwritten ledger detailing how the $1.5 million had been spent, titled "Nir Consulting Funds."[6]  Malecki Decl., Ex. G.  Defendant Rokah only transferred the additional fee on the condition that he did not waive any potential legal claims on the full deposit.  *See* Malecki Decl., Ex. H.  On July 25, 2019, Defendant Rokah received a signed statement from Clear Landing stating "I Nathaniel Land of Clear Landing Capital LLC

---

[5] Although one deposit agreement contains Plaintiff's personal email address, the rest contain a Clear Landing email address and all agreements are titled as agreements with Clear Landing. Malecki Decl., Ex. I.

[6] The ledger presented by Defendants does not sum up to $1.5 million.  Nevertheless, the Court accepts these facts as true because they are uncontested and ancillary to this motion.

acknowledge that by receiving the extra [fee] towards Nir Rokah participant fee, I am not dismissing any of Nir Rokah's potential claims to date."[7]  *Id.*  On January 7, 2020, Clear Landing and Defendants entered a collateral agreement ("Collateral Agreement") concerning Defendants' $2 million that they had deposited with Plaintiff.  Malecki Decl., Ex. J.  The Collateral Agreement consisted of an email concerning Defendants' "Further steps"[8] and included a screenshotted cell phone note containing Plaintiff's signature.  *Id.*  The Collateral Agreement further went on to provide that Plaintiff (on behalf of Clear Landing) guaranteed Defendants' full $2 million fee by pledging as collateral art appraised at $3.5 million.  *Id.*

In February 2020, Defendant Rokah met with Plaintiff and his partner Gary Herman in Germany to discuss the ARIDO Deal.  Statement of Claim at 11.  Plaintiff informed Defendant Rokah that Mr. Raphael was "doing everything in his power to torpedo deals with potential buyers who had expressed interest in purchasing the brand's diamond jewelry" and that "he did not see any real feasibility of making a deal to sell the brand's diamond jewelry."  *Id.*  On March 1, 2020, the parties had a call with Mr. Herman and Mr. Raphael to discuss the dissolution of the deal.  *Id.* On the call, Mr. Raphael told Defendant Rokah that he was in possession of art items worth more than $2 million and that they would be used as collateral against the $2 million Defendant Rokah had already deposited with Plaintiff.  *Id.*

On March 3, 2020, Defendant Rokah alleges that he demanded Plaintiff return the $2 million he deposited.  *Id.*  On April 22, 2020, Plaintiff emailed Mr. Raphael and his colleagues at

---

[7] The Court notes that, despite the alleged $500,000 outstanding, the written agreement states it is concerning a $350,000 fee.  Malecki Decl., Ex. H.

[8] The Collateral Agreement does not, in writing, specify what the "further steps" are, nor does either party elaborate.

ARIDO regarding the collateral art. Malecki Decl., Ex. K. It was clear from the exchange that Plaintiff could not obtain the collateral for Defendants' deposit from Mr. Raphael, and Plaintiff threatened litigation. *Id.* Defendant Rokah was copied on the email. *Id.* The $2 million was never returned to Defendants.

In October 2020, prior to pursuing FINRA arbitration, Defendants initiated an action against BHS and Plaintiff in Israel, but the Israeli court dismissed the case for lack of jurisdiction. Rokah Decl. ¶ 4. On October 14, 2022, Defendants initiated FINRA arbitration proceedings against Plaintiff and BHS. *See* Statement of Claim; Compl. ¶ 8. Plaintiff then filed this current action on January 31, 2023, seeking to enjoin the arbitration.

## DISCUSSION

### I.   Legal Standard

"Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 53 (2d Cir. 2001) (quoting *AT & T Techs. v. Communications Workers of America*, 475 U.S. 643, 649 (1986)). Here, Plaintiff requests a preliminary injunction to prevent arbitration with respect to Defendants' claims. Although a district court has "wide discretion in determining whether to grant a preliminary injunction," *Mullins v. City of New York*, 634 F. Supp. 2d 373, 384 (S.D.N.Y. 2009), *aff'd*, 626 F.3d 47 (2d Cir. 2010) (quotations omitted), it is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotations omitted). To obtain a preliminary injunction, the movant must show "irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a

6

balance of hardships tipping decidedly in plaintiff's favor." *Citigroup Glob. Markets Inc. v. VCG Special Opportunities Master Fund Ltd.* ("*VCG I*"), No. 08-CV-5520BSJ, 2008 WL 4891229, at *2 (S.D.N.Y. Nov. 12, 2008), *aff'd*, 598 F.3d 30 (2d Cir. 2010) (quoting *Almontaser v. N.Y. City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir.2008)). "[T]he Second Circuit has held that a party necessarily suffers irreparable harm if 'forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable.'" *UBS Sec. LLC v. Voegeli*, 684 F. Supp. 2d 351, 354 (S.D.N.Y. 2010), *aff'd*, 405 F. App'x 550 (2d Cir. 2011) (quoting *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003)).

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (cleaned up). There is generally a presumption in favor of arbitration under the Federal Arbitration Act; however, "[b]ecause the parties here dispute the existence of an obligation to arbitrate, not the scope of an arbitration clause," that presumption does not apply. *Citigroup Glob. Markets Inc. v. Abbar*, 761 F.3d 268, 274 (2d Cir. 2014).

## II.    The Applicability of FINRA Rule 12200

FINRA is a "self-regulatory organization established under Section 15A of the Securities Exchange Act of 1934 . . . and has had the authority to exercise comprehensive oversight over all securities firms that do business with the public." *UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (internal citations and quotations omitted). All FINRA registered brokers and FINRA member firms are contractually bound by FINRA's rules and regulations. *Id.* At the time of these alleged events, Plaintiff was a registered FINRA broker

7

and an associated person of BHS, a FINRA member.[9]

Under the FINRA's Code of Arbitration Procedure for Customer Disputes Rule ("FINRA

Rule") 12200, a member or associated person is required to arbitrate a customer dispute where:

> (1) Required by a written agreement, or
> (2) Requested by the customer;
>> • The dispute is between a customer and a member or associated person of a member; and
>> • The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

*Gelman v. Borruso*, No. 19-CV-10649 (RA), 2020 WL 4266678, at *3 (S.D.N.Y. July 23, 2020)

(quoting FINRA Rule 12200). It is undisputed that there was no agreement between the parties to

arbitrate disputes and that Defendants are requesting arbitration. Therefore, the Court turns to

FINRA Rule 12200's other requirements to determine whether (1) this dispute is between a

customer requesting arbitration and an associated person or member; and (2) it arises in connection

with the "business activities" of the member or associated person.

Under FINRA Rule 12100(k), a "customer" is defined only as "not includ[ing] a broker or

dealer." FINRA Rule 12100(k). Recognizing this definition as insufficient, *cf. W. Virginia Univ.*

*Hosps.*, 660 F.3d at 649–50, the Second Circuit uses a bright line definition of "customer" for the

purposes of compelling arbitration under FINRA Rule 12200, as "one who, while not a broker or

dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a

FINRA member." *Abbar*, 761 F.3d at 275. Providing services without either direct or indirect

payment does not suffice. *Id.* (finding no customer relationship where a FINRA member provided

services but they were not purchased). Additionally, "an indirect or attenuated relationship is

---

[9] Plaintiff is no longer an associated person of BHS, nor is he a still a FINRA registered broker. Land Decl. ¶ 4; Malecki Decl., Ex. E.

8

insufficient." *UBS Fin. Servs., Inc. v. Zimmerman*, No. 5:16-CV-155-FL, 2017 WL 1167227, at

*3 (E.D.N.C. Mar. 28, 2017).  If someone is a customer of an associated person under the FINRA

Code, then arbitration is required.  *See Triad Advisors, Inc. v. Siev*, 60 F. Supp. 3d 395, 396–97

(E.D.N.Y. 2014).

At bottom, the definition of "customer" must be consistent with the "reasonable

expectations" of FINRA Members and associated persons.  *Wachovia Bank, Nat. Ass'n v. VCG*

*Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011) (quotations omitted).

As such, "[a]n investor is most likely a customer of the associated person if the latter acts as a

broker, providing advice regarding investments and facilitating the sale of securities to the

investor, and if the associated person acted as a representative of the FINRA member." *Berthel*

*Fisher & Co. Fin. Servs., Inc. v. Frandino*, No. CV-12-02165-PHX-NVW, 2013 WL 2036655, at

*5 (D. Ariz. May 14, 2013).  Despite the bright line rule established in *Abbar*, whether or not

someone is a customer of an associated person is an inherently factual determination.  *See SunTrust*

*Banks, Inc. v. Turnberry Cap. Mgmt. LP* ("*SunTrust II*"), 566 F. App'x 32, 33–34 (2d Cir. 2014)

(affirming where the district court considered "(a) the receipt of financial advice, (b) the existence

of a brokerage agreement, (c) the payment of a fee, and (d) the utterance of statements that could

have been perceived by [the defendant] as establishing a customer relationship").

Here, Defendants undisputedly did not hold an account with Plaintiff or with BHS, nor did

Defendants purchase any goods from Plaintiff.  The crux of the parties' dispute is whether or not

Defendants purchased services from Plaintiff.  On this point, Plaintiff alleges that (1) Defendants

did not purchase services from him or BHS; (2) to the extent there were services purchased, they

9

were not within the scope of "business activities" of BHS or Plaintiff.[10]

The Court finds that Plaintiff has raised serious questions with respect to whether Defendants purchased services from him, consistent with *Abbar*. "The serious questions standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Lincoln Fin. Sec. Corp. v. Foster* ("*Lincoln I*"), No. 20-CV-1132 (VLB), 2020 WL 6150916, at *5 (D. Conn. Oct. 20, 2020) (quotations omitted). "Because the moving party must not only show that there are serious questions going to the merits, but must additionally establish that the balance of hardships tips *decidedly* in its favor . . . its overall burden is no lighter than the one it bears under the likelihood of success standard." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.* ("*VCG II*"), 598 F.3d 30, 35 (2d Cir. 2010) (cleaned up).

It is clear from the submissions of both parties that Plaintiff never advised Defendants to make their initial investment in ARIDO, which would potentially indicate a customer relationship. *See, e.g., Triad*, 60 F. Supp. 3d at 398 (finding a dispute FINRA arbitrable in part based on an associated person's investment advice); *Viyella v. Fundacion Nicor*, No. 19-25094-CIV, 2020 WL 3315904, at *4 (S.D. Fla. Apr. 23, 2020) (finding a dispute FINRA arbitrable where "[the

_____

[10] The Court declines to address the issue of whether there is any meaningful distinction between Plaintiff operating as an officer of Clear Landing or in his individual capacity because it does not need to address this issue to reach its conclusion. Generally, an associated person's participation in an approved outside business activity does not limit the arbitrability of the claim against a FINRA member. *Cf. Barzelatto v. Spire Sec., LLC*, No. 19 CIV. 6238 (CM), 2019 WL 8889865, at *9 (S.D.N.Y. Nov. 5, 2019) (noting FINRA arbitration was appropriate based on an associated person's actions through his outside business activity). Given this precedent, and because the Court decides the motion on other grounds, it assumes *arguendo* that Plaintiff may face arbitration in his individual capacity.

defendant] states it relied on [the plaintiff's] investment advice in purchasing the promissory note"). Rather, it was Mr. Raphael who solicited the funds from Defendant Rokah personally, pursuant to a transaction that occurred without any input or involvement from Plaintiff. *See SunTrust Banks, Inc. v. Turnberry Cap. Mgmt. LP* ("*SunTrust I*"), 945 F. Supp. 2d 415, 425–26 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 32 (2d Cir. 2014) (quoting *Morgan Keegan & Co. v. McPoland*, 829 F. Supp. 2d 1031, 1035 (W.D. Wash. 2011)) ("The investors bought shares in the fund from third-party brokers on the secondary market. Their information was from the street."); *Virchow Krause Cap., LLC v. North* ("*Virchow II*"), No. 11 C 8169, 2012 WL 1952731, at *3 (N.D. Ill. May 30, 2012) (finding no customer relationship where the defendant was not involved in the decision to invest).

Nor is there any agreement between the Plaintiff and Defendants for the exchange of brokerage services. *Wachovia*, 661 F.3d at 174 (enjoining an arbitration because, *inter alia,* there was no brokerage agreement between the parties). Instead, the record reflects the following agreements: (1) Defendants' Oral Agreement with a third party (Mr. Raphael) to purchase an option regarding luxury jewelry; (2) several deposit slips that obliquely state that Clear Landing would "provide services" regarding "potential purchases" of ARIDO; (3) a one sentence agreement preserving Defendant Rokah's potential future litigation claims; and (4) an email purporting to document "further steps" guaranteeing Defendants' full fee, after the transaction apparently soured.[11] These agreements do not indicate that Plaintiff provided financial advice or specialized investment services; they barely evince a direct relationship between the parties, much

---

[11] All other written agreements in the record are unsigned and, according to Defendants, inaccurate. *See* Statement of Claim at 6 n.6 (detailing the reasons the written agreements do not reflect the real agreements).

11

less a multi-million-dollar customer relationship.[12]

Further, on the current record, it is unclear that Plaintiff did anything banking related to Defendants' $2 million "investment" itself other than hold the money, potentially in escrow, as President of Clear Landing. *Cf. Berthel Fisher*, 2013 WL 2036655, at *7 ("Receiving funds invested in an LLC does not constitute the type of 'investment or brokerage services' contemplated by FINRA."). The remaining facts regarding the transaction are disputed and inconsistent, and there is little concrete evidence to determine the true nature of Plaintiff's involvement. And while it is clear that Plaintiff's involvement with ARIDO's business was consistent and substantial, the nature of his work for the company and his compensation *for* that work remain contested and vague. Answering these questions is essential to determining the customer status of Defendant, especially considering Plaintiff's agreement with Mr. Raphael and ARIDO, the alleged counterparties to the transaction. *See Wachovia*, 661 F.3d at 173–74 (finding no customer relationship where FINRA member participated in the transaction but did not recommend it or have a preexisting brokerage relationship with the other party). Given that the purchase of services from a FINRA-registered member or broker is dispositive on the question of arbitrability, the dearth of established facts concerning Plaintiff's involvement in Defendants' transaction means there is a serious question that goes to the merits of the dispute, and an injunction is warranted.

Defendants spill little ink on the *Abbar* standard in their briefing, focusing instead on "FINRA's broad definition of 'customer' [that] serves to protect investors from fraud or

---

[12] This is what separates these deposit agreements from the agreements in *Lek Sec. Corp. v. Elek*, 118 N.Y.S.3d 606 (N.Y. App. Div. 1st Dep't 2020). In *Lek*, the parties agreed in written agreements that "respondent [would] act as the 'Processing Broker' to provide the services of depositing *and reselling*" securities, subject to multiple terms and conditions. *Id.* (emphasis added). By contrast here, the deposit slips merely state that Clear Landing will "provide services" with respect to Defendants' purchase, with no more specific instruction.

misbehavior." Defs.' Opp. at 23, ECF No. 17. While FINRA has ample jurisdiction to help protect investors, it must be balanced against the reasonable expectations of FINRA members and brokers, who are bound to arbitrate claims when they are acting in their FINRA-registered capacity. Balancing these principles was precisely what led the Second Circuit to articulate a "simple, predictable, and suitably broad definition" of the word "customer." *Abbar*, 761 F.3d at 276.

Further, it is not sufficient to compel arbitration that the investor purchased *any* services from the member or associated person; the dispute must arise "in connection with the business activities of the member or the associated person." FINRA Rule 12200. Courts in the Second Circuit have found that a dispute must arise "in connection with the investment banking or securities business activities of a member or associated person." *Lincoln Fin. Sec. Corp. v. Foster* ("*Lincoln II*"), No. 20-CV-1132 (VLB), 2021 WL 1197534, at *4 (D. Conn. Mar. 29, 2021).

The court in *Lincoln* adopted the Fourth Circuit's characterization of "business activities." *See UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 327 (4th Cir. 2013); *Raymond James Financial Services, Inc. v. Cary*, 709 F.3d 382, 386 (4th Cir. 2013). Specifically, in *Carilion Clinic*, the Fourth Circuit held "that 'customer,' as that term is used in the FINRA Rules, refers to one, not a broker or a dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are regulated by FINRA— namely *investment banking and securities business activities*." 706 F.3d at 37 (emphasis added); *cf. Abbar*, 761 F.3d at 276 (citing the *Carilion Clinic* definition of "customer" favorably). This definition is consistent with FINRA's mission, which is, *inter alia,* "to promote through cooperative effort *the investment banking and securities business*, to standardize its principles and practices, to promote therein high standards of commercial honor, and to encourage and promote among members observance of *federal and state securities laws*." Restated Certificate of

13

Incorporation of Financial Industry Regulatory Authority, Inc. § 3 (July 2, 2010) (emphasis added); *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 740 (9th Cir. 2014). It is also consistent with New York state courts' interpretations of FINRA Rule 12200. *See, e.g., Sinclair & Co. LLC v. Pursuit Inv. Mgmt. LLC*, 903 N.Y.S.2d 395, 396 (N.Y. App. Div. 1st Dep't 2010) (granting a preliminary injunction where the broker's rendered services were not "sufficiently investment-related"). The Court therefore determines that, to arbitrate a claim before the FINRA arbitration panel, the claim must arise out of the "business activities" of the associated person related to the FINRA member, namely their investment banking and securities business activities. To read the FINRA Code more broadly would be inconsistent with the purpose of the organization and the expectations of its members. *See Pictet Overseas Inc. v. Helvetia Tr.*, 905 F.3d 1183, 1191 (11th Cir. 2018) (Pryor, J., concurring) (cleaned up) ("The fatal flaw in the [defendants] interpretation [of FINRA Rule 12200] is that it is a viperine construction that kills the text by reading the text hyperliterally, ignoring its context.").

The record before the Court presents an unclear picture of the transaction at issue. Defendant Rokah states that he and Mr. Raphael reached an agreement for "option to purchase ARIDO brand jewelry." Rokah Decl. ¶ 7. The record does not present a more detailed description of the transaction. Even if the Court were to rely solely on the Statement of Claim and accept the allegations as true, Defendants describe the transaction in the following manner:

> Mr. Raphael told Mr. Rokah that since works of art do not have a "catalog" price, and the price is set by market forces, it is very important that an investor is found, who will invest in the brand's diamond jewelry an initial amount, at a very high value of $100,000,000, in order to be able to argue to potential buyers that the value of the brand's diamond jewelry has already been estimated at that price by the investor. The initial amount that Mr. Raphael believed could be presented to potential buyers as an amount indicative of the seriousness of the investor's intentions was $2,000,000. Mr. Raphael's offer to Mr. Rokah was as follows: Mr. Rokah deposits $2,000,000 in exchange for an option to purchase the brand's diamond jewelry for $100,000,000. However, it was clear to Mr. Raphael and Mr.

Rokah that Mr. Rokah had no intention (or financial capacity) to do so, but his interest in the transaction could maximize the value of the brand's diamond jewelry to potential buyers.

Statement of Claims at 7 n.5. This does not provide context for Plaintiff's involvement in the transaction, nor for its relationship to FINRA regulated activities. *See Lincoln II*, 2021 WL 1197534, at *5 ("To date, there has been no evidence to establish that Mr. Horowitz received any compensation for securities products or investment advice or services."); *INTL FCStone Fin., Inc. v. Jacobson*, No. 19 C 1438, 2019 WL 2356989, at *7 (N.D. Ill. June 4, 2019) (finding no FINRA jurisdiction where "[t]he underlying disputes here concern accounts and transactions of commodity futures and options, not securities" and therefore "Defendants' relationships and disputes with [the plaintiff] do not fall within FINRA's regulatory ambit"). Further, if the transaction at issue really is an "option to purchase ARIDO Brands Jewelry," even if Defendant Rokah sought a profit, it is far from the type of transaction generally regulated by FINRA. *See Morgan Keegan & Co. v. Silverman*, 706 F.3d 562, 568 (4th Cir. 2013) (granting an injunction where the transaction did not occur "in the course of its business activities regulated by FINRA").

Defendants rely on *Triad Advisors, Inc. v. Siev*, claiming that the court "found investors to be customers of FINRA members who had no account or securities with the FINRA member." Defs.' Opp. at 23–24 (citing *Triad*, 60 F. Supp. 3d at 397). *Triad* is distinguishable in this case. First, in that case the defendants clearly relied upon the investment advice of an associated person, something lacking in this case. *Triad*, 60 F. Supp. 3d at 397. Second, the parties in *Triad* did not dispute that there were securities at issue in a real estate venture recommended by the associated person. *See Triad Advisors, Inc. v. Siev*, 1:14-cv-05557-BMC, Am. Compl. ¶ 36, ECF No. 11. Here, Plaintiff disputes that a failed transaction regarding potential diamonds investments involved securities, and Defendants do not contradict this argument. While the absence of securities does

not necessarily defeat FINRA jurisdiction,[13] given the unique circumstances of this case and the disputed nature of the transaction, the utter lack of financial instruments involved at least raises serious questions about FINRA's regulatory interest in this matter. *See Lincoln I*, 2020 WL 6150916, at *5 (granting a preliminary injunction where the plaintiff raised serious questions as to whether "any of the Claimant[s] were securities customers of [Plaintiff]").

The Court emphasizes that the determination of whether someone is a "customer" is necessarily a factual one. The parties will be able to more fully outline the nuances of the relationship, the payments made, and the brokerage services at issue at the summary judgment phase. *Virchow Krause Cap., LLC v. North* ("*Virchow I*"), No. 11 C 8169, 2012 WL 123673, at *2 (N.D. Ill. Jan. 17, 2012) ("The parties will [] be able to present a more detailed record concerning matters such as the precise business relationship, . . . the contacts [between the parties], and when they occurred."). At this stage of the litigation, Plaintiff has simply raised serious questions that go the merits, and on the basis of that holding, the Court finds that a preliminary injunction is warranted.

## III.   Substantial Harm to Plaintiff

The last inquiry is whether the balance of harm tips in favor of Plaintiff, and this question is easily answered in the affirmative. As previously noted, forcing Plaintiff to arbitrate these claims will cause irreparable harm. There is no indication that Defendants would be unable to pursue arbitration if they eventually prevail on the question of arbitrability. Therefore, because "a preliminary injunction will simply maintain the status quo until this Court decides the underlying issues," the balance of hardships tips in favor of Plaintiff. *VCG I*, 2008 WL 4891229, at *6.

---

[13] This Second Circuit has explicitly declined to decide the precise contours of FINRA jurisdiction with respect to non-securities disputes. *See VCG II*, 598 F.3d at 39.

16

## CONCLUSION

Because Plaintiff has raised serious questions going to the merits and the balance of hardships tips decidedly in his favor, Plaintiff's motion for a preliminary injunction is **GRANTED**. Defendants' cross motion to compel arbitration is **DENIED** without prejudice as to its renewal at a later stage in this litigation.  The Clerk of the Court is directed to terminate the motion at ECF No. 4.

Dated: New York, New York
      July/7, 2023

SO ORDERED

*Paul A Crotty*

HONORABLE PAUL A. CROTTY
United States District Judge